## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**LORI CHAVEZ-DEREMER, Secretary of the U.S. Department of Labor,**

   ***Plaintiff,***

  **v.**

**JERRY'S CARING HANDS, INC., *et al.*,**

   ***Defendants.***

Civil No.: 1:24-cv-00213-JRR

## <u>MEMORANDUM OPINION</u>

Plaintiff Lori Chavez-DeRemer,[1] Secretary of the United States Department of Labor ("Plaintiff" and "DOL," respectively), initiated this action against Defendants Jerry's Caring Hands, Inc., and Ebere Ogbonnah, individually and as owner, officer, and manager of Jerry's Caring Hands, Inc., for violations of Sections 6, 7, 11(c), 15(a)(2), and 15(a)(5) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201, *et seq.* (the "FLSA"). (ECF No. 1; the "Complaint.") Pending before the court is Plaintiff's Motion for Summary Judgment. (ECF No. 30; the "Motion.") The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, the Motion will be granted in part and denied in part.

## I. BACKGROUND

Plaintiff initiated this action against Defendants Jerry's Caring Hands, Inc. ("Jerry's") and Ogbonnah for alleged overtime, minimum wage, and recordkeeping violations under the FLSA. (ECF No. 1.) Jerry's "provides home health care services to the elderly and disabled population around the Baltimore and Eastern Shore area of Maryland." (ECF No. 1 ¶ 2; ECF No. 11 ¶ 2.)

---

[1] Lori Chavez-DeRemer was sworn in as Secretary of Labor on March 11, 2025. Pursuant to Federal Rule of Civil Procedure 25(d), Madam Clerk shall substitute Lori Chavez-DeRemer for Julie A. Su as Plaintiff in this action.

Ogbonnah is the CEO and sole owner of Jerry's.  (ECF No. 1 ¶ 3; ECF No. 11 ¶ 3.)  Plaintiff attaches a "Schedule A" to her Complaint, which lists individuals currently and formerly employed by Defendant from at least May 5, 2020, through at least May 4, 2023.  (ECF No. 1 at p. 5.)  The majority of these individuals are Home Health Aids ("HHAs") who are either licensed Certified Nursing Assistants ("CNAs") or, where a client signs a waiver pursuant to MD. CODE REGS. 10.07.05.10(D), unskilled caregivers (usually a family member or loved one of the client).[2]

## II.    UNDISPUTED FACTS

### A.  Preliminary Procedural Matters

Before turning to the undisputed facts, the court must first address two issues presented by the parties' papers.  The first issue pertains to Defendants' admissions of fact pursuant to Federal Rule of Civil Procedure 36; the second pertains to Defendants' failure to comport with Rule 56(c)(1).

Pursuant to Federal Rule of Civil Procedure 56(c)(1)(A), Plaintiff relies upon Defendants' Rule 36 admissions to establish material undisputed facts.  (Defs.' Admissions, ECF No. 30-9.)  In their Opposition to the Motion (ECF No. 35), Defendants contend that Plaintiff misconstrues or uses only portions of the admissions in a manner that purportedly changes their import.  In her Reply (ECF No. 38), Plaintiff argues that Defendants cannot escape their admissions and that Defendants arguments effectively and improperly ignore them.

An admission under Federal Rule of Civil Procedure 36 "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  FED. R. CIV. P. 36(b).  "The purpose of such admissions is to narrow the array of issues before the court, and thus expedite

---

[2] In his deposition, Ogbonnah (and Plaintiff's counsel) referred to these individuals collectively as "HHAs," *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 19:9–18.  The court utilizes similar language here but acknowledges the distinction between HHAs who are CNAs and those that are subject to the waiver provision.

both the discovery process and the resolution of the litigation." *Adventis, Inc. v. Consol. Prop. Holdings, Inc.*, 124 F. App'x 169, 172 (4th Cir. 2005). District courts have discretion to determine the scope and effect of a party's admission under Rule 36, but this discretion "is not unfettered." *Id.* at 173. "[O]nce a matter that is properly subject of an admission under Rule 36(b) has been admitted during discovery, the district court is not free to disregard that admission." *Id.* Indeed, consistent with Rule 36(b), "an admission may be withdrawn only if: a) the withdrawal would promote the presentation of the merits of the action, and b) allowing the withdrawal would not prejudice the party that obtained the admission." *Id.* Importantly, while Defendants are free to argue that their admissions do not carry the legal significance Plaintiff urges, they have not sought to withdraw their admissions. The court, therefore, considers Defendants' admissions of fact as conclusively established for purposes of identifying the record of undisputed facts.

As for the second issue, to the extent Defendants "assert[] that a fact . . . is genuinely disputed," they must do so "by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1). Alternatively, Defendants may "object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). To the extent Defendants attempt to dispute asserted facts absent reference to admissible materials in the record, they fail to demonstrate a genuine dispute of fact. Defendants must "present more than their own unsupported speculation and conclusory allegations to survive" summary judgment. *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023). In that same vein, Defendants purport to take issue with certain asserted undisputed facts when, in reality, they simply challenge the related legal conclusions Plaintiff asks the court to draw from those record facts. Where Defendants' disagreement with a fact is not as to the fact itself, but to the potential

3

legal consequence of said fact, they similarly fail to demonstrate a genuine dispute of material fact as required by the rule.

The court turns now to the undisputed facts.

**B. About Jerry's**

1.     Jerry's is a Maryland corporation with a principal place of business located at 12 Willow Creek Court, Parkville, Maryland.  Ogbonna serves as Jerry's Director and Resident Agent.  (Articles of Incorporation, ECF No. 30-6 ¶ 1; Ogbonnah Dep. Tr., ECF No. 30-8 at 15:10–21).

2.     During the relevant time period, Jerry's was an enterprise engaged in commerce or in the production of goods for commerce under Section 3(s)(1)(A) of the FLSA.  (ECF No. 30-1 ¶ 2; ECF No. 35 ¶ 2; Defs.' Admissions, ECF No. 30-9 ¶ 2.)

3.     During the relevant time period, Ogbonnah was the sole owner, president, and chief executive officer of Jerry's. (Ogbonnah Dep. Tr., ECF No. 30-8 at 14:15–22.)

4.     During the relevant time period, the individuals listed in Schedule A appended to the Complaint worked for Defendants to provide HHA and skilled nursing services.  (ECF No. 30-1 ¶ 3; ECF No. 35 ¶ 6; Defs.' Admissions, ECF No. 30-9 ¶ 3.)

5.     Jerry's provides a number of services depending on client needs, including personal care—dressing, bathing, transferring, grooming, and eating; chores—cooking, laundry, light cleaning, and shopping; and assistance with other activities of daily living.   (ECF No. 30-1 ¶ 4; ECF No. 35 ¶ 4.)

6.     During the relevant time period, Jerry's had an annual gross volume of sales in an amount not less than $500,000.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 21:20–22:13.)

7.      Throughout the relevant time period, Defendants employed, on average, 20 to 60 individuals. (ECF No. 30-1 ¶ 7; Ogbonnah Dep. Tr., ECF No. 30-8 at 18:4–21).  Defendants contend that this number includes employees and independent contractors.  (Ogbonnah Aff., ECF No. 35-1.)

8.      The majority of these individuals were HHAs, as well as "one or two" Licensed Practical Nurses ("LPNs"), along with two or three support or office staff.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 19:12–20:1.)

**C.  About Employment with Jerry's**

9.      During the relevant time period, Ogbonnah made decisions relating to the compensation policies affecting workers,[3] including setting rates of pay and overtime policies. (ECF No. 30-1 ¶ 10; ECF No. 35 ¶ 10; Ogbonnah Dep. Tr., ECF No. 30-8 at 44:16–49:3; Defs.' Admissions, ECF No. 30-9 ¶ 4.)

10.     During the relevant time period, Ogbonnah had the ability to hire, fire, and discipline workers. (ECF No. 30-1 ¶ 11; Ogbonnah Dep. Tr., ECF No. 30-8 at 44:7–15; Defs.' Admissions, ECF No. 30-9 ¶¶ 7–8, 12–13).  That notwithstanding, Jerry's clients "determine[] who works for them."  (Ogbonnah Aff., ECF No. 35-1 ¶ 1.)

11.     During the relevant time period, Ogbonnah had the authority to promulgate work rules for workers, including setting compensation, benefits, work schedules, rate of pay, and methods of payment. (Defs.' Admissions, ECF No. 30-9 ¶ 5.)

12.     During the relevant time period, Ogbonnah supervised Jerry's workers.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 48:20–22; Defs.' Admissions, ECF No. 30-9 ¶ 9.)

---

[3] Where appropriate, the court refers to "workers" consistent with Defendants' papers.

13.     During the relevant time period, Ogbonnah controlled Jerry's payroll and tax records for workers. (Defs.' Admissions, ECF No. 30-9 ¶ 11.)

14.     During the relevant period, Ogbonnah made decisions relating to policies regarding recordkeeping of hours worked by workers. (Defs.' Admissions, ECF No. 30-9 ¶ 6.)[4]

15.     All workers "ideally" needed permission from Ogbonnah if they were unable to work on a particular day. (Ogbonnah Dep. Tr., ECF No. 30-8 at 37:18–20, 40:19–21.) According to Defendants, this was to ensure there was "no gap in service to the client by providing another HHA." (ECF No. 30 ¶ 16; Ogbonnah Aff., ECF No. 35-1 ¶ 9.)

16.     The workers Defendants contend are independent contractors do not work for a set contract rate and are able to "work as long as they want to work" with Jerry's. (Ogbonnah Dep. Tr., ECF No. 30-8 at 38:1–10.)

17.     The HHAs did not have any managerial duties, but there was a "hierarchy" when on a job site wherein one HHA might direct the actions of others. (Ogbonnah Dep. Tr., ECF No. 30-8 at 39:17–40:8.)

18.     While some of the HHAs might have been hired for certain clients, their employment was not time-limited. (Ogbonnah Dep. Tr., ECF No. 30-8 at 39:5–16.)

19.     All workers are "ideally" supervised in the same manner. (Ogbonnah Dep. Tr., ECF No. 30-8 at 41:11–17.)

20.     All workers must follow Jerry's policies and procedures. (Ogbonnah Dep. Tr., ECF No. 30-8 at 41:18–21.)

---

[4] Defendants purport to "dispute" that Ogbonnah had authority to set worker compensation, and promulgate rules regarding benefits, work schedules, rates of pay, and methods of payment, and that he "made decisions relating to policies regarding recordkeeping of hours worked" on the basis that these matters are subject to Maryland law, and because workers worked in client homes, which were "supervised by the client and/or representatives." (ECF No. 35 ¶¶ 12–13.) This neither creates nor constitutes a genuine dispute of material fact. Fed. R. Civ. P. 56(c). Defendants admit that Ogbonnah "supervised employees" and "controlled the records of employees, such as payroll and taxes," but add that these matters are subject to Maryland law. Id. ¶¶ 14-15.

### D. Jerry's Payroll Practices

21.     Defendants determine how many hours to pay workers for by using clock-in and clock-out data from the State of Maryland ISAS system and Jerry's timesheets. (Ogbonnah Dep. Tr., ECF No. 30-8 at 78:17–79:18, 89:5–13.)  Defendants contend, however, that this is subject to the hours set forth in the applicable Plan of Service—a service plan developed with Jerry's, the client, and the HHA—approved by the State of Maryland.  (Ogbonnah Aff., ECF No. 35-1 ¶ 20.)

22.     To use ISAS, HHAs use the client's phone or the app to clock in and clock out. (Ogbonnah Dep. Tr., ECF No. 30-8 at 79:1–12.)

23.     Workers confirmed they would use ISAS to record the number of hours worked each day.  (Decl. A, ECF No. 30-16 ¶ 6; Decl. B, ECF No. 30-17 ¶ 7.)

24.     Throughout the relevant period, Defendants did not pay overtime to workers who worked more than 40 hours in a workweek. (Ogbonnah Dep. Tr., ECF No. 30-8 at 44:20–45:13, 63:20–64:17.)

25.     Payroll records reflect that, during the relevant time period, Defendants' workers were paid their straight time hourly rate for all hours worked, including overtime hours. Defendants contend this is because they "pay independent contractors and employees the number of hours approved by the State of Maryland [in] the Plan of Service," which is agreed to by Jerry's, the HHA, and the client.  (ECF No. 35 ¶ 23; Ogbonnah Aff., ECF No. 35-1 ¶ 13.)

26.     By way of example:

> In the two-week pay period ending February 8, 2022, payroll records indicate that Debra Casper, who worked as an HHA for Defendants, was paid a regular rate of $11.75 and worked a total of 120 hours, with 40 overtime hours. The records show that Casper was paid $11.75 for all hours worked, including overtime, and did not indicate that she was paid an overtime premium.  (Feb. 9, 2022 Payroll Journal, ECF No. 30-10.)

In that same pay period, William Gooch, who also worked as an HHA for Defendants, earned a regular rate of pay of $11.75 and worked a total of 112 hours, with 32 overtime hours. The records show that Gooch was paid $11.75 for all hours worked and there is no indication that he was paid an overtime premium. *Id.*

In the pay period ending October 1, 2024, William Gooch earned a regular rate of $15.00 per hour and worked a total of 111 hours, with 31 overtime hours. The records show that Gooch was paid $15.00 per hour for all hours worked and there is no indication that he was paid an overtime premium. (Oct. 2, 2024 Payroll Journal, ECF No. 30-15.)

In that same pay period, Gerileigh Farrow, who worked as an HHA for Defendants, earned a regular rate $16.00 per hour and worked a total of 106 hours, with 26 overtime hours. The records show that Farrow was paid $16.00 for all hours worked and was not paid an overtime premium. *Id.*

27.     Defendants continued to pay straight time for overtime after the subject DOL Wage and Hour investigation and beyond the relevant period.[5]  (ECF No. 30-1 ¶ 26; ECF No. 35 ¶ 26.) *See also* Oct. 2, 2024 Payroll Journal, ECF No. 30-15.

28.     Ogbonnah admits that the payroll records for the relevant time period would not contain a single instance of Defendants paying overtime to their workers, unless by mistake. (Ogbonnah Dep. Tr., ECF No. 30-8 at 64:8–17.)

29.     There were instances where the number of hours for which Defendants paid workers was less than the number of hours actually worked and recorded in ISAS. (Ogbonnah Dep. Tr., ECF No. 30-8 at 82:6–85:14, 90:5–91:11; Nov. 30, 2022 Payroll Journal, ECF No. 30-13; Allen ISAS Summary, ECF No. 30-14; May 4, 2022 Payroll Journal, ECF No. 30-11; Cosme ISAS Summary, ECF No. 30-12.)  Two examples are provided in the ISAS Summaries and Payroll Journals concerning Adriana Allen and Quiana Cosme.[6]  *See id.*

---

[5] At deposition, in response to this question, Ogbonnah invoked his Fifth Amendment privilege against self-incrimination.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 114:8–21, 115:3–17.)

[6] Defendants contend these ISAS summaries are false; however, they offer no evidence in support of same. (Ogbonnah Dep. Tr., ECF No. 30-8 at 85:2–,8, 91:20–22; ECF No. 35 ¶ 37.)  Per Rule 56(c), Defendants therefore fail to generate a dispute of fact on this point. *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that a party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive" summary judgment).

30.     In these instances, Defendants would pay workers the number of hours allocated in the plan of care (the Plan of Service), regardless of how many hours were recorded in ISAS. (Ogbonnah Dep. Tr., ECF No. 30-8 at 86:11–89:13, 116:5–10.)

31.     Ogbonnah acknowledged "there were times where the ISAS data and . . . number of hours paid on the payroll" were going to be "different." (Ogbonnah Dep. Tr., ECF No. 30-8 at 85:9–20.)

32.     Throughout the relevant period, Defendants' payroll records did not reflect any hours worked in excess of forty hours per workweek, regardless of whether workers reported doing so. (Payroll Record Excerpts, ECF Nos. 30-13, 30-15; ISAS Summaries, ECF Nos. 30-12, 30-14; Ogbonnah Dep. Tr., ECF No. 30-8 at 59:4–60:10.)

**E.  Defendants' Awareness of FLSA Protections**

33.     Defendants were aware that their hourly employees were entitled to overtime under the FLSA. (Ogbonnah Dep. Tr., ECF No. 30-8 at 70:16–19, 76:5–77:1; Defs.' Admissions, ECF No. 30-9 ¶ 32.)

34.     Defendants did not consult with an attorney prior to deciding not to pay their workers overtime. (Ogbonnah Dep. Tr., ECF No. 30-8 at 72:6–10; Defs.' Admissions, ECF No. 30-9 ¶ 31.)

35.     Defendants did not consult with DOL or any other government agency before making the decision not to pay their workers overtime. (Ogbonnah Dep. Tr., ECF No. 30-8 at 72:11–14; Defs.' Admissions, ECF No. 30-9 ¶ 31.)

36.     Defendants did not consult with their accountant before deciding not to pay their workers overtime. (Ogbonnah Dep. Tr., ECF No. 30-8 at 72:15–18; Defs.' Admissions, ECF No. 30-9 ¶ 31.)

37.     Unidentified workers attest that they complained to Ogbonnah regarding the lack of overtime pay and that Ogbonnah told them that Defendants do not pay overtime because the state does not pay overtime. (Decl. A, ECF No. 30-16 ¶¶ 12, 13; Decl. B, ECF No. 30-17 ¶ 12.) Ogbonnah attests that Defendants did not receive any complaints "from independent contractors about overtime pay because they were independent contractors." (Ogbonnah Aff., ECF No. 35-1 ¶ 32.)

### F.  Claims Asserted

While Plaintiff does not set forth specific counts, she generally alleges three categories of violations:

> Overtime Violations in violation of Section 7 of the FLSA, 29 U.S.C. § 207(a);
>
> Minimum Wage Violations in violation of Section 6 of the FLSA, 29 U.S.C. § 206(a); and
>
> Recordkeeping Violations in violation of Section 11(c) of the FLSA, 29 U.S.C. § 211(c).

(ECF No. 1 ¶¶ 7–13.)[7] Following the close of discovery, Plaintiff moved for summary judgment on all claims as well as for findings of willfulness, liquidated damages, and a permanent injunction. (ECF No. 30.)

## III.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308,

---

[7] Plaintiff also asserts violation of Section 15 of the FLSA, 29 U.S.C. § 215(a)(2), (a)(5), which provides that "it shall be unlawful for any person—to violate any of the provisions of section 206 or 207 of [the FLSA]" and "to violate any of the provision of section 211(c) of [the FLSA]."

313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).    A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.    *Id.* at 249.    Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).    A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that a party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive").    Further, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC,* 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson,* 477 U.S. at 252).

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.    *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).    The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the

trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## IV. ANALYSIS

Plaintiff now seeks summary judgment on all of her claims, contending that the undisputed material facts show Defendants failed to pay employees overtime wages in violation of FLSA Section 7(a), failed to pay employees a minimum wage of $7.25 an hour for all hours of work in violation of FLSA Section 6(a), and failed to maintain accurate payroll records in violation of FLSA Section 11(c). (ECF No. 30-1 at pp. 14–17.) Plaintiff also urges she is entitled to a finding of willfulness, liquidated damages, and a permanent injunction. Defendants oppose the Motion, arguing first that they are not subject to the FLSA protections because (1) Jerry's is not an enterprise engaged in commerce under Section 3(s); (2) the workers at issue were independent contractors; and (3) Ogbonnah is not an employer under the FLSA. (ECF No. 35 at pp. 16–25.)[8] They also contend there are genuine disputes of material fact that bar entry of summary judgment on Plaintiff's claims. *Id.* at pp. 25–33.

### A. Overarching Legal Principles: the FLSA

"Enacted in 1938, the FLSA established a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31 (2014). "As a 'remedial and humanitarian statute,' the FLSA seeks to 'protect all covered workers from substandard wages and oppressive working hours.'" *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 384 (4th Cir. 2025) (first quoting *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125, 133 (4th Cir. 2017); then quoting *Barrentine v. Arkansas-Best*

---

[8] Unless otherwise stated, page citations to Defendants' Opposition refer to CM/ECF pagination.

*Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)).  In keeping with those goals, Congress "applied the FLSA broadly," defining "employee," "employer," and "employ" with great breadth.  *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 240 (4th Cir. 2016) (citing 29 U.S.C. §§ 203(d), (e)(1), & (g)).  Indeed, the Supreme Court has "consistently construed" the FLSA "'liberally to apply to the furthest reaches consistent with congressional direction,' . . . recognizing that broad coverage is essential to accomplish the goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency."  *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 296 (1985) (first quoting *Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 211 (1959); then citing *Powell v. United States Cartridge Co.,* 339 U.S. 497, 516 (1950)).

### 1. *Enterprise Engaged in Commerce*

"The FLSA covers all employees, regardless of the type of work they perform, if they are employed by 'an enterprise engaged in commerce,' as defined by Section 3(s) of the statute." *Russell v. Cont'l Rest., Inc.*, 430 F. Supp. 2d 521, 524 (D. Md. 2006).  Pursuant to Section 3(s), an enterprise is "engaged in commerce or in the production of goods for commerce" where, relevant here, it "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and has "no less than $500,000" in annual sales.  29 U.S.C. § 203(s)(1)(A); *see Ergashov v. Glob. Dynamic Transportation, LLC*, 680 F. App'x 161, 163 (4th Cir. 2017) (discussing same).  In enacting the FLSA, Congress recognized that "the employment of persons in domestic service in households affects commerce."  29 U.S.C. § 202(a).  DOL regulations interpreting the FLSA provide that "domestic service employment" refers to, *inter alia*, HHAs and personal care aides.  29 C.F.R. § 552.3.[9]

---

[9] DOL regulations are not binding on the court but are persuasive authority for the court's consideration.  *See, e.g.*, 29 C.F.R. § 785.2 (noting that the "ultimate decision interpretations of the [FLSA] are made by the courts"); *Loper Bright*

Plaintiff insists that there is no dispute that Jerry's is an enterprise engaged in commerce under the FLSA, pointing to Defendants' repeated admissions of same and Congress's express declaration that domestic service in households affects commerce.  (ECF No. 30-1 at pp. 11–12.) Defendants repeatedly admitted this element.  In their response to Plaintiff's Rule 36 requests for admissions, Defendants admit that, during the relevant period, Jerry's "was an enterprise engaged in commerce or in the production of goods for commerce under Section 3(s)(1)(A) of the [FLSA], 29 U.S.C. § 201, et seq., § 203(s)(1)(A)."  (Defs.' Admissions, ECF No. 30-9 ¶ 2.)  Moreover, in their Opposition to the Motion, Defendants agree it is "undisputed" that Jerry's was "an enterprise engaged in commerce or in the production of goods for commerce under Section 3(s)(1)(A) of the FLSA" during the relevant time period.  (ECF No. 35 at p. 4.)  Notwithstanding these express concessions, Defendants offer the rather rote argument that Plaintiff has not shown Defendants' provision of home health care services in Maryland affects interstate commerce.[10]

Defendant's argument is not compelling for multiple reasons.  First, Defendants' position neglects that Congress specifically recognized that the employment of persons in domestic services, like HHAs and personal care aides per DOL regulations, affects commerce.  29 U.S.C. § 202(a).  The Supreme Court has directed that the FLSA should be construed "liberally to apply to the furthest reaches consistent with congressional direction." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 296 (1985) (quoting *Mitchell v. Lublin, McGaughy & Associates,* 358 U.S. 207, 211 (1959)).  Other courts have made findings consistent with these pronouncements.  *See, e.g.*, *Su v. Nursing Home Care Mgmt. Inc.*, No. 21-CV-02583, 2023 WL 3440237, at *3 (E.D. Pa.

---

*Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (explaining that it "remains the responsibility of the court to decide whether the law means what the agency says" (quoting *Perez v. Mortgage Bankers Assn.*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

[10]  Defendants do not challenge that Jerry's has an annual gross volume in sales in an amount not less than $500,000. (Ogbonnah Dep. Tr., ECF No. 30-8 at 21:20–22:13; ECF No. 35 ¶ 6.)

May 12, 2023), *aff'd sub nom.*, 128 F.4th 146 (3d Cir. 2025), and *aff'd sub nom.*, 128 F.4th 146 (3d Cir. 2025) (holding, on a motion for summary judgment, that employees in domestic service in households affect commerce, per 29 U.S.C. § 202(a)(5)); *Walsh v. Americare Healthcare Servs., Inc.*, No. 2:21-CV-5076, 2023 WL 2544509, at *4 (S.D. Ohio Mar. 16, 2023) (rejecting, on a motion to dismiss, defendants' argument that "'direct care work' and 'in-home caregiving' are 'quintessentially local and intra-state in nature'" against the backdrop of 29 U.S.C. § 202(a) and 29 C.F.R. § 552.3); *Franklin v. Jenn's Angels, LLC*, No. CV 21-399-SDD-SDJ, 2022 WL 69213, at *2 (M.D. La. Jan. 6, 2022) (finding, on a motion to dismiss, that the defendant's argument that "their localized home healthcare company did not affect interstate commerce" to be "meritless" in view of 29 U.S.C. § 202(a) and 29 C.F.R. § 552.3).

In view of the foregoing, Plaintiff has demonstrated to the court's satisfaction that Jerry's is an enterprise engaged in commerce as set forth in 29 U.S.C. § 203(s)(1)(A).

### 2. *Ogbonnah as an Employer under the FLSA*

The FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency . . . ." 29 U.S.C. § 203(d). "Employers include those with managerial responsibilities and 'substantial control of the terms and conditions of the work of . . . employees.'" *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) (quoting *Falk v. Brennan*, 414 U.S. 190, 195 (1973)). While not always "necessarily an employer for FLSA purposes," *see Jones v. Hoffberger Moving Servs. LLC*, 92 F. Supp. 3d 405, 415 (D. Md. 2015), "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (quoting *Donovan v. Agnew,* 712 F.2d 1509, 1511

(1st Cir. 1983)); *see Acosta v. At Home Pers. Care Servs. LLC*, No. 118CV549LMBIDD, 2019 WL 1601997, at \*13 (E.D. Va. Apr. 15, 2019) (same).

"To determine whether the employer-employee relationship exists, courts apply the 'economic reality' test." *Id.* The "touchstone" of the test is "whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself.'" *McFeeley v. Jackson St. Ent.*, LLC, 825 F.3d 235, 241 (4th Cir. 2016) (citation modified) (quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)).

The economic realities test to determine employer status requires the court to consider: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Kerr*, 824 F.3d at 83 (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). "No single factor is dispositive." *Schultz*, 466 F.3d at 305 (citing *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994), *as modified on denial of reh'g* (Dec. 5, 1994)).

In support of her argument that Ogbonnah is an employer under the FLSA, Plaintiff offers undisputed evidence in support of each factor. She points to Ogbonnah's ability to hire, fire, and discipline workers (which he did during the relevant time period), *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 43:21–44:15; Defs.' Admissions, ECF No. 30-9 ¶¶ 8–9, 12–13; his supervision of workers, *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 48:20–22; Defs.' Admissions, ECF No. 30-9 ¶ 9; his authority to establish rules for Jerry's workers, including setting compensation, benefits, work schedules, rates of pay, and methods of payment, *see* Defs.' Admissions, ECF No. 30-9 ¶ 5; his decisions during the relevant time period regarding compensation policies, including setting rates of pay, *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 44:16–19, 49:1–4; Defs.' Admissions, ECF

No. 30-9 ¶ 4; and his decisions during the relevant time period regarding recordkeeping of workers' hours, as well as their payroll and tax records, *see* Defs.' Admissions, ECF No. 30-9 ¶¶ 6, 11.  The aforementioned evidence bears directly on the factors at issue—Ogbonnah's power to hire and fire, to supervise and control schedules, to determine the rate and method of pay, and to maintain employment records.  *See Kerr*, 824 F.3d at 83, *supra*.  Further, the undisputed evidence is that Ogbonnah, who was the sole owner, president and CEO of Jerry's, exercised significant control over Jerry's operations, including with respect to its workers.  *See Grim Hotel*, 747 F.2d at 972 and *At Home Pers. Care Servs.*, 2019 WL 1601997, at *13, *supra*.

Contrary to Defendants' admissions and testimony, they now argue Ogbonnah is not an FLSA employer.  Instead, they contend Ogbonnah 1) did not have the power to hire and fire HHAs because the client has a decision-making role, and 2) could not discipline HHAs, and did not provide HHAs day-to-day supervision, because HHAs work in clients' homes.  (ECF No. 35 at pp. 19–21.)  In support of the first enumerated contention, Defendants' cite Ogbonnah's affidavit provided in support of Defendants' opposition to the Motion; the second enumerated contention is made with no support whatsoever. These assertions are not well-taken.

First, as addressed above, Defendants' admissions are conclusively established record facts.  The admitted facts satisfy all four factors of the applicable test: Ogbonnah can, and did, hire, fire, discipline, supervise, set pay rates, and establish rules for workers during the relevant time period.  Second, Ogbonnah's self-serving affidavit directly contradicts his deposition testimony; as such, it fails to create a genuine dispute of material fact and is "insufficient to stave off summary judgment."  *Jones v. Fairfax Cnty. Sch. Bd.*, No. 123CV00359AJTLRV, 2024 WL 1704664, at *3 (E.D. Va. Apr. 19, 2024) (citing cases).  "It is beyond cavil that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that

. . . contradicts the affiant's previous deposition testimony." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999) (quoting *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir. 1996)).

These portions (if not the entirety) of Ogbonnah's affidavit run afoul of what is known as the sham affidavit rule. Under this rule, a party is blocked from creating a genuine issue of material fact by relying on an affidavit created after the party's deposition has been taken, when the affidavit is materially inconsistent with, or contradictory to, his deposition testimony. The principle espoused by the rule acknowledges that "prior depositions are more reliable than affidavits"; and affidavits "are usually drafted by counsel, whose familiarity with summary judgment procedure may render an affidavit less credible." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). As well explained in *Adefila v. DaVita, Inc.,* 1:13cv940, 2015 WL 268983 (M.D.N.C. Jan. 20, 2015):

> The rule has its genesis in a Second Circuit case from 1969, *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969), and the general approach has found approval with virtually every federal circuit, as well as the Supreme Court*, see Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Jiminez,* 503 F.3d at 252 (collecting circuit court cases). The Fourth Circuit has articulated a version of the sham affidavit rule, explaining that "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) (citing *Radobenko v. Automated Equipment Co.*, 520 F.2d 540, 544 (9th Cir. 1975)). In *Barwick,* the Fourth Circuit also quoted and approved of the rule as set out in *Perma Research*: "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (quoting *Perma Research,* 410 F.2d at 578).

2015 WL 268983, *4.[11]

In view of the foregoing, Plaintiff has established that Ogbonnah is an employer as a matter of law under the FLSA.

### 3. *Workers Identified as Independent Contractors*

The FLSA defines "employee" as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  Similarly broad, the term "employ" means "to suffer or permit to work."  *Id.* § 203(g). These definitions, with "striking breadth," "stretch[] the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)).  The FLSA, however, does not cover certain categories of workers, including, relevant here, independent contractors, from its protections.[12]

---

[11] Even were the court to consider these portions of the affidavit (despite *Jones, Bickerstaff* and *Barwick, supra*), Ogbonnah's affidavit fails to create a dispute of material fact as to the economic realities employer test.  Ogbonnah attests that the client has decision-making authority about who works in his home, *see* Ogbonnah Aff., ECF No. 35-1 ¶ 1; that Defendants' clients have authority to decide who does and does not work in their homes does not diminish Ogbonnah's expansive authority about which he testified and Defendants admitted.  Further, Ogbonnah admits in his affidavit that he provides (and provided) supervision. *Id.* ¶ 11

[12]  Defendants have not asserted, nor does the court discern, that the companionship exemption under 29 U.S.C. § 213(a)(14) is applicable here, which excepts from the requirements under Sections 6 and 7 of the FLSA "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves."  As the Eastern District of Virginia recounted:

> In 2013, the DOL substantially amended the governing regulations. Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60,454 (codified at 29 C.F.R. pt. 552). Those amendments, which became effective on January 1, 2015, *see id.* at 60,455, were consequential for companies like [the defendant] for multiple reasons. . . . [T]hey reversed course and provided that "[t]hird party employers of employees engaged in companionship services . . . may not avail themselves of the . . . [§ 213(a)(15) ] exemption . . . , even if the employee is jointly employed by the individual or member of the family or household using the services," *id.* (codified at 29 C.F.R. § 552.109(a) ) (emphasis added). The DOL explained that because structural changes in the home care industry had expanded the number of large, professionalized companies claiming the companionship services exemption, it was necessary to adjust the regulations "[t]o better ensure that the domestic service employees to whom Congress intended to extend FLSA protections in fact enjoy those protections." *Id.* at 60,455; *see also id.* at 60,460 (emphasizing the "high percentage of home care workers employed by third parties or agencies"); *id.* at 60,481-83 (further explaining the reasons for the change).

*Chavez-Deremer v. Med. Staffing of Am.*, LLC, 147 F.4th 371, 384 (4th Cir. 2025) (citations omitted).

Where a court lacks better guidance on determining if an individual is an employee under the FLSA, it considers the "totality of the circumstances," looking to "'the economic realities of the relationship between the worker and the putative employer' in deciding whether a particular worker is a covered employee." *Scott v. Baltimore Cnty., Maryland*, 101 F.4th 336, 341–42 (4th Cir. 2024), *cert. denied sub nom.*, No. 24-515, 2025 WL 1020362 (U.S. Apr. 7, 2025) (citing *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016)).

As discussed above, the economic realities test is focused on "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *McFeeley*, 825 F.3d at 241 (alteration in original) (citation modified) (quoting *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)). The economic realities test to determine employee status requires the court to consider:

> (1) [T]he degree of control that the putative employer has over the manner in which the work is performed;
> (2) the worker's opportunities for profit or loss dependent on his managerial skill;
> (3) the worker's investment in equipment or material, or his employment of other workers;
> (4) the degree of skill required for the work;
> (5) the permanence of the working relationship; and
> (6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* (quoting *Schultz*, 466 F.3d at 304–05). Again, "[n]o single factor is dispositive." *Schultz*, 466 F.3d at 305 (citing *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994), *as modified on denial of reh'g* (Dec. 5, 1994)).

---

*Acosta v. At Home Pers. Care Servs. LLC*, No. 118CV549LMBIDD, 2019 WL 1601997, at *2 (E.D. Va. Apr. 15, 2019)(emphasis in original).

"If after application of the six 'economic reality' factors the moving party has shown that there is 'no doubt' as to the relationship between the parties, the court may determine as a matter of law that the worker is an employee or independent contractor." *McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 268 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016) (citing *Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452, 459 (D. Md. 2000)). But where "the parties dispute numerous material facts that impact the application of these factors, the movant has failed to show the worker's status as a matter of law and is not entitled to summary judgment on this issue." *Id.* (citation omitted).

Before reaching its consideration of the economic realities test, the court first addresses a preliminary matter. Plaintiff's argument as to the status of the workers as employees focuses almost entirely on HHAs. She acknowledges that Defendants also employ LPNs, ECF No. 30-1 ¶ 8, and Defendants assert that at least one LPN who provides medical, as opposed to domestic, services is listed in Schedule A. (ECF No. 35 at p. 22.) Despite this, Plaintiff fails to address economic realities factors as they pertain to the LPNs. The court appreciates that Plaintiff's argument as to the first factor applies to all of the workers, but the remaining factors present possible areas of distinction. Where Plaintiff has not addressed application of the factors as to LPNs, she has failed to meet her burden as to these workers. The court will therefore deny the Motion in part on that basis and constrain its analysis as follows to the remaining majority of Defendants' workers—the HHAs.

Turning to the issues here, "as in so many FLSA disputes," the parties "offer competing narratives of their working relationship." *McFeeley*, 825 F.3d at 241. Plaintiff contends the HHAs were employees subject to the FLSA. Defendants, expectedly, argue to the contrary – that the

HHAs are "independent contractors" not covered by the FLSA.[13]  "[T]he employee/independent contractor distinction is not a bright line but a spectrum, and . . . courts must struggle with matters of degree rather than issue categorical pronouncements." *Id.*  That said, employers cannot escape liability by "cherry-pick[ing] a few facts that supposedly tilt in their favor and downplay[ing] the weightier and more numerous facts indicative of an employment relationship." *Id.*

With these principles in mind, the court turns to the economic realities factors regarding whether the HHAs at issue are non-exempt FLSA employees or independent contractors not covered by the FLSA.

    a.  <u>Degree of Control</u>

The first factor is the " degree of control that the putative employer has over the manner in which the work is performed." *McFeeley*, 825 F.3d at 241.  "Central to this inquiry is whether the employer 'control[s] the meaningful economic aspects of the business,' such that 'the worker has a viable economic status that can be traded . . . to other companies.'" *Med. Staffing of Am.*, 147 F.4th at 400 (first quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987); next quoting *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 381 (5th Cir. 2019)). The inquiry is focused not on "the degree of control that an alleged employer has over the manner in which the work is performed in comparison to that of *another employer*," but rather "the degree of control that the alleged employer has in comparison to the control exerted by the *worker*." *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 305 (4th Cir. 2006) (emphasis in original).

As the Fourth Circuit recently summarized:

> "To guide this evaluation," a court must "ask whether the company 'retains the right to dictate the manner' of the worker's performance." *See Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d

---

[13] The court notes that Defendants admitted in discovery that the workers were "either employees or independent contractors," Defs.' Admissions, ECF No. 30-9 ¶ 1, and now assert that "most" of the individuals in Schedule A "are independent contractors."  (ECF No. 35 at p. 3.)

> 1050, 1060 (6th Cir. 2019) (quoting *Donovan v. Brandel*, 736 F.2d
> 1114, 1119 (6th Cir. 1984)). Importantly, a "lack of supervision over
> minor regular tasks cannot be bootstrapped into an appearance of
> real independence." *See Parrish*, 917 F.3d at 381. Rather, a court
> conducting such an analysis should assess the control factor through
> the "focal point" of economic dependence: That is, "whether the
> worker has control over such a meaningful portion of his labor that
> he operates as a separate economic entity." *See Schultz*, 466 F.3d at
> 304; *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656, 666 (7th Cir.
> 2022).

147 F.4th at 400.

The court turns to the relevant undisputed facts. Plaintiff argues that Defendants "exercised a high degree of control over their HHAs." (ECF No. 38 at p. 5.) The court agrees. While Defendants attempt to paint a narrative wherein these workers have basically no relation to Jerry's, the uncontradicted evidence tells a different story. As discussed above, Ogbonnah admits that he was able to, and did, hire, fire, and discipline the HHAs, *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 43:21–44:15; Defs.' Admissions, ECF No. 30-9 ¶¶ 8–9, 12–13; that he supervised the HHAs, *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 48:20–22; Defs.' Admissions, ECF No. 30-9 ¶ 9; that he established the rules regarding compensation, benefits, work schedules, and pay rates for the workers, *see* Defs.' Admissions, ECF No. 30-9 ¶ 5; that he set the HHAs' rates of pay, *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 44:16–19, 49:1–4; Defs.' Admissions, ECF No. 30-9 ¶ 4; and that he maintained payroll and tax records for the HHAs, *see* Defs.' Admissions, ECF No. 30-9 ¶¶ 6, 11. The aforementioned evidence bears directly on the factors at issue—Ogbonnah's power to hire and fire, to supervise and control schedules, to determine the rate and method of pay, and to maintain employment records. *See Kerr*, 824 F.3d at 83, *supra*. The court notes further that, for HHAs Casper, Gooch, Allen, and Farrow, Plaintiff offers their Form W-2s, not Form 1099s for non-employee compensation (used for independent contractors), all of which identify Jerry's as

their employer.  (Form W-2s, ECF No. 38-1.)  This evidence is demonstrative of Defendants'
significant control over the HHAs.

Ogbonnah's affidavit contradicting his prior testimony does not create a dispute of fact
here—both because it cannot, *see Bickerstaff*, 196 F.3d at 455, *supra*, and because the testimony
does not meaningfully contradict any of the evidence asserted above.  Further, Defendants'
contention that their control of the HHAs related to certain regulations is unavailing.  As Plaintiff
notes, "[t]hat an industry is heavily regulated does not mean that those working in the industry are
not 'employees.'"  *Acosta v. At Home Pers. Care Servs. LLC*, No. 118CV549LMBIDD, 2019 WL
1601997, at *9 (E.D. Va. Apr. 15, 2019).

Based on the undisputed facts, the first factor—the putative employer's degree of control—
weighs in favor of an employee-employer relationship under the FLSA.

b.  <u>Opportunities for Profit or Loss</u>

The second factor is "the worker's opportunities for profit or loss dependent on his
managerial skill."  *McFeeley*, 825 F.3d at 241.  "[T]he ability to generate more money based on
skill and hard work denotes independent contractor status." *McFeeley*, 47 F. Supp. 3d at 269
(quoting *Herman v. Mid–Atlantic Installation Servs., Inc.*, 164 F.Supp.2d 667, 674 (D. Md. 2000)).
"Put simply, the more the worker's earnings depend on his own managerial capacity rather than
the company's, the less the worker is economically dependent on the business and the more he is
in business for himself."  *Med. Staffing of Am.*, 147 F.4th at 404 (citation modified) (quoting
*McFeeley*, 825 F.3d at 243).

"Where the putative employee's work is, by its nature, time oriented, not project oriented,
courts have weighed the second . . . factor in favor of employee status." *Randolph v. PowerComm
Const., Inc.*, 309 F.R.D. 349, 357 (D. Md. 2015) (citing *Montoya v. S.C.C.P. Painting Contractors,*

*Inc.*, 589 F. Supp. 2d 569, 580 (D. Md. 2008)).  That workers may be "able to work additional hours to increase their wages" is not enough where they are not able to "make business strategy decisions that would typically be associated with the ability to increase the profits of an independent business such as what amount and type of equipment to use, what types of jobs to take, whether to hire assistants, whether to invest in advertisements, or whether to adjust pricing." *Id.*

Here, Defendants set the rate of pay for each HHA. (Ogbonnah Dep. Tr., ECF No. 30-8 at 44:16–19, 49:1–4; Defs.' Admissions, ECF No. 30-9 ¶ 4.)  Defendants determined the amount of hours of work for which the workers were paid (which Defendants contend was per the Plan of Service provided to the State).  (Ogbonnah Aff., ECF No. 35-1 ¶ 22.)  Defendants established the applicable rules governing HHA compensation, work schedules, and pay rates.  (Defs.' Admissions, ECF No. 30-9 ¶ 5.)  The court appreciates that Defendants contend that such policies must align with Maryland law, but that does not materially affect the analysis.  The HHAs did not have traditional managerial authority.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 39:17–40:8.)  While some of the HHAs may have been hired for certain clients, their employment was not time-limited or project-based.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 39:5–16.)  The evidence does not support a reasonable conclusion that the HHAs' profits or losses were dependent on their managerial capacities or skills.

Based on the undisputed material facts, the second factor weighs in favor of an employee-employer relationship under the FLSA.

c.   <u>Investment in Equipment or Material, or Employment of Others</u>

The third factor is "the worker's investment in equipment or material, or his employment of other workers." *McFeeley*, 825 F.3d at 241.  "[T]he more a worker 'is personally invested in

the capital and labor of the enterprise, the less the worker is economically dependent on the business.'" *Med. Staffing of Am.*, 147 F.4th at 406 (quoting *McFeeley*, 825 F.3d at 241). The worker's "relative investment" is viewed in comparison to the putative employer's investment. *Id.* (citing *Mr. W Fireworks*, 814 F.2d at 1052).

Relevant here, "the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status," as it is "not at all uncommon" for workers to invest in "negligible materials or equipment." *Id.* (first quoting *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989); then quoting *Schultz*, 466 F.3d at 308). Such purchases are "not the type of 'large capital expenditures, such as risk capital and capital investments' that are dispositive" of this inquiry. *Id.* (quoting *Snell*, 875 F.2d at 802). "[S]ubstantial investments" include things like "maintaining corporate offices, printing brochures and contracts, providing accounting services, and developing and underwriting insurance products." *Id.* (citing *Hopkins*, 545 F.3d at 344).

Even assuming that the HHAs may have had occasion to use their own equipment to the extent it is not available at a client's home, *see* ECF No. 35 at p. 22 (noting that Defendants do not provide equipment or supplies in client's homes), there is no evidence before the court showing the HHAs' relative investments or employment of others. What the record does plainly show is that Defendants established the work policies and payment infrastructure. (Defs.' Admissions, ECF No. 30-9 ¶¶ 5–6, 11.) Defendants managed payroll and received payment for clients (seemingly via insurance and the State of Maryland). (Ogbonnah Dep. Tr., ECF No. 30-8 at 50:11–51:7.) Defendants advertised for employment, *id.* at 23:10–12, and maintained Jerry's office space, *id* at 15:11–16:17. Under Jerry's policies, the HHAs were not allowed to hire anyone to work for themselves. *Id.* at 42:8–17. In fact, Defendants concede that the work of HHAs does not

require "investment or purchase of supplies or equipment" on their part.  (Defs.' Admissions, ECF No. 30-9 ¶ 18.)

The undisputed material facts show "minimal relative investment required of" the HHAs as compared to "the significant capital investments normally made by independent contractors." *Med. Staffing of Am.*, 147 F.4th at 407, *supra*.  Therefore, the third factor weighs in favor of an employee-employer relationship under the FLSA.

### d.  Degree of Skill Required

The fourth factor is "the degree of skill required for the work."  *McFeeley*, 825 F.3d at 241.  "[T]he worker's economic dependence on the putative employer is central to the degree of skill inquiry," meaning "it is not only whether the workers 'have some unique skill set' but also whether they possess 'some ability to exercise significant initiative within the business.'"  147 F.4th at 407 (citing *Parrish*, 917 F.3d at 387).

While Defendants contend this factor is "neutral" due to the nature of the "relationship between the client and the caregiver," Defendants allow that the majority of the HHA workers are unskilled.   It appears undisputed that some (if not most) of the workers at issue would not be considered skilled workers.  (Ogbonnah Aff., ECF No. 35-1 ¶¶ 1, 7.)  Further, while the court notes the CNA qualification of some HHAs, there is no evidence that the specific work at issue here required significant medical care, denoting or requiring such degree of skill.  (Ogbonnah Aff., ECF No. 35-1 ¶ 4.)  Indeed, such work, "in traditional terms,"  is performed by low-skilled workers.  *At Home Pers. Care Servs.*, 2019 WL 1601997, at *8.

This fourth factor similarly supports the existence of an employee-employer relationship under the FLSA.

e.  Permanence of the Working Relationship

The fifth factor is "the permanence of the working relationship." *McFeeley*, 825 F.3d at 241.  "The more permanent the relationship, the more likely the worker is to be an employee." *Schultz*, 466 F.3d at 309.  "Generally, independent contractors have variable or impermanent working relationships, with employers." *Med. Staffing of Am.*, 147 F.4th at 408 (4th Cir. July 17, 2025) (citation modified) (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015)).  They also "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Id.* (quoting *Keller*, 781 F.3d at 807).

While it is undisputed that the HHAs are able to "work as long as they want to work," *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 38:1–10, Defendants urge that the nature of these positions is inherently project-based as they are tied to a specific client receiving care through Jerry's.  (ECF No. 35 at p. 22.)  Defendants' point is well-taken, but the court is not persuaded that aspect of the HHAs' employment favors independent contractor status.  As the *At Home Personal Care Services* court recognized, although the HHAs "often worked in time-limited capacities—both because the plans of care under which they worked had to be periodically reevaluated and because the patients for whom they cared could change—they did not work in the temporary, project-related capacity typically associated with independent contracting."  *At Home Pers. Care Servs.*, 2019 WL 1601997, at *8.  Based on the undisputed record, the same is true here.

Accordingly, this factor weighs in favor of an employee-employer relationship under the FLSA, albeit not as strongly as the other factors.

f.   Services as Integral

The final factor is "the degree to which the services rendered are an integral part of the putative employer's business." *McFeeley*, 825 F.3d at 241.  Plaintiff argues there is "no doubt that the HHAs' services were integral to Defendants' business."  (ECF No. 38 at p. 7.)  Defendants contend that this factor is "inapplicable because Jerry's serves as a staffing agency for government beneficiaries."  (ECF No. 35 at p. 23.)  Defendants' position is disingenuous at best.  They admit that "Jerry's Caring Hands provides home health care services to the elderly and disabled population around the Baltimore and Eastern Shore area of Maryland."  (ECF No. 1 ¶ 2; ECF No. 11 ¶ 2.)  They describe their services as assistance with personal care, chores, and other activities of daily living—all of which are provided by the HHAs.  (Ogbonnah Aff., ECF No. 35-1 ¶ 4.) Further, though not dispositive, Ogbonnah testified that caregiving work was his "calling," which is why he started Jerry's and why he named it "Jerry's Caring Hands."  (Ogbonnah Dep. Tr., ECF No. 30-8 at 13:15–14:14.)  To suggest that the HHAs' services are not integral to Defendants' work flies in the face of Defendants' multiple admissions and testimony.

The final factor strongly favors an employee-employer relationship under the FLSA.

g.   Consideration of the Factors

Considering the undisputed facts before the court, all of the factors of the economic realities test support the existence of an employee-employer relationship under the FLSA.  The court thus finds that the undisputed material facts demonstrate as a matter of law that the HHAs had an employer-employee relationship with Defendants; and that the HHAs were employees covered under the FLSA.  Having determined Plaintiff has met her burden to show the relationship at issue was subject to the provisions of the FLSA, the court turns to the meat of Plaintiff's claims.

### B. Overtime Violations

Section 7(a) of the FLSA provides:

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  Plaintiff contends the undisputed evidence establishes that Defendants violated this provision in two ways: first, by not paying overtime, and second, by failing to pay employees for all hours worked over 40 hours in a workweek.  (ECF No. 30-1 at pp. 14–15.)

As to the first, the material facts here are undisputed: "Defendants did not pay overtime to employees working over forty hours in a workweek."  (ECF No. 30-1 ¶ 22; ECF No. 35 ¶ 22; Ogbonnah Dep. Tr., ECF No. 30-8 at 44:20–45:13, 64:4.)  The payroll records show examples of employees, specifically Casper, Gooch, and Farrow, receiving straight pay for overtime hours.  (Feb. 9, 2022 Payroll Journal, ECF No. 30-10; Oct. 2, 2024 Payroll Journal, ECF No. 30-15.)  There is not a "single instance" of Defendants intentionally paying overtime to an employee who worked over 40 hours in a workweek.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 64:5–17.)  Based on the foregoing, and having concluded the HHAs are employees under the FLSA, the court concludes Defendants violated Section 7(a) as a matter of law in failing to pay overtime.

As to the second, Plaintiff contends that the undisputed facts show that Defendants admitted to paying employees for fewer hours than were tracked in the relevant time keeping system.  As discussed above, Ogbonnah admitted that the number of hours worked on payroll did not match the number of hours worked as reported by an employee.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 85:9–20.)  There were instances, for example with Allen and Cosme, where the number

of hours for which workers were paid was less than the number of hours actually worked and recorded in ISAS. (Ogbonnah Dep. Tr., ECF No. 30-8 at 82:6–85:14, 90:5–91:11; Nov. 30, 2022 Payroll Journal, ECF No. 30-13; Allen ISAS Summary, ECF No. 30-14; May 4, 2022 Payroll Journal, ECF No. 30-11; Cosme ISAS Summary, ECF No. 30-12.)  As discussed above, while Defendants contend these ISAS summaries are false, they offer no evidence in support of this conclusory assertion, and rely entirely on speculation.  (Ogbonnah Dep. Tr., ECF No. 30-8 at 85:2–,8, 91:20–22; ECF No. 35 ¶ 37.)  *See Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that a party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive" summary judgment).  It is undisputed that Defendants pay workers the number of hours allocated in the Plan of Service regardless of how many hours were recorded in ISAS. (Ogbonnah Dep. Tr., ECF No. 30-8 at 86:11–89:13, 116:5–10.)  With the above-noted exception, Defendants do not contradict this evidence, but urge they are not in violation of the provision because the HHAs are obliged to work only those hours approved of in the Plan of Service.  Defendants' argument is unavailing.

As relayed above, to "employ" under the FLSA means "to suffer or permit to work."  29 U.S.C. § 203(g).  "That broad definition effectuates the FLSA's remedial purpose by preventing an employer from circumventing the FLSA by feigning ignorance to its employees' overtime work."  *Richardson v. All. Residential Co.*, No. CV ELH-18-1114, 2020 WL 551316, at *8 (D. Md. Feb. 4, 2020), *on reconsideration in part,* No. CV ELH-18-1114, 2020 WL 2061512 (D. Md. Apr. 29, 2020).  This principle is further reflected in the promulgated regulations.  "Work not requested but suffered or permitted is work time."  29 C.F.R. § 785.11.  The duty is on the employer "to exercise its control and see that the work is not performed if it does not want it to be performed."  29 C.F.R. § 785.13.  "It cannot sit back and accept the benefits without compensating for them.

31

The mere promulgation of a rule against such work is not enough." *Id.* That an employee "voluntarily continue[s] to work at the end of the shift," for whatever reason, does not absolve the employer of its responsibility. 29 C.F.R. § 785.11.

As such, "[t]he crucial question is not whether the work was voluntary, but rather whether the plaintiff was in fact performing services for the benefit of the employer with the knowledge and approval of the employer." *Truslow v. Spotsylvania Cnty. Sheriff*, 783 F. Supp. 274, 278–79 (E.D. Va. 1992) (citation modified) (quoting *Republican Pub. Co. v. Am. Newspaper Guild*, 172 F.2d 943, 945 (1st Cir. 1949)); *see also, e.g.*, *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 290 (2d Cir. 2008) (holding "once it is established that an employer has knowledge of a worker's overtime activities and that those activities constitute work under the [FLSA], liability does not turn on whether the employee agreed to work overtime voluntarily or under duress"); *Reich v. Dep't of Conservation & Nat. Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (recognizing that "[a]n employer 'does not rid himself of that duty because the extent of the business may preclude his personal supervision[] and compel reliance on subordinates'"); *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir. 1975) (noting that an employer "who wishes no such work to be done has a duty to see it is not performed" and it "cannot accept the benefits without including the extra hours in the employee's weekly total for purposes of overtime compensation"); *Wirtz v. Bledsoe*, 365 F.2d 277, 278 (10th Cir. 1966) (noting "[i]t has long been established that the purpose of the [FLSA] cannot be frustrated by an employer's instructions or even a contract not to work overtime").

Based on the evidence discussed above, there is no dispute that Defendants knew their employees were working additional hours (*i.e.*, in excess of 40 hours per workweek) in providing services to clients and for Defendants, and Defendants did not exercise control to stop that practice.

Instead, they simply adjusted pay to conform with what, according to Defendants, the HHAs should have worked. Plaintiff is entitled to judgment as a matter of law on this claim.

### C. Minimum Wage Violations

Under Section 6(a), an employer "shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce" a minimum wage of $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). Plaintiff's argument here, again, rests on undisputed material facts. Plaintiff provides record evidence that put two examples before the court. First, during one pay period, employee Allen reported 103.54 hours in ISAS. (Allen ISAS Summary, ECF No. 30-14.) According to the payroll records, she was only paid for 50 hours of work, and her rate of pay was $13 per hour. (Nov. 30, 2022 Payroll Journal, ECF No. 30-13.) But Allen received only $650 for that pay period – which breaks down to an hourly rate of $6.28. *Id.* Similarly, during a different pay period, Cosme reported 106.86 hours in ISAS, and her rate of pay was $13.75 per hour. (Cosme ISAS Summary, ECF No. 30-12.) According to the payroll records, she was only paid for 47 hours of work. (May 4, 2022 Payroll Journal, ECF No. 30-11.) Cosme received $646.25 for that pay period, which reflects an hourly rate of $6.05. *Id.* Defendants contend these employees were not intended to work hours that exceeded the Plan of Service. That may be the case, but there is no evidence before the court that Defendants instructed these workers not to work in excess of the Plan of Service, or that they otherwise exercised their managerial authority to cabin hours worked to 40 or below per workweek.

Plaintiff has met her Rule 56 burden. Based on the undisputed material facts, Plaintiff is entitled to judgment as a matter of law that Defendants violated Section 6(a) of the FLSA in failing to pay a minimum wage for each hour worked.

### D. Recordkeeping Violations

Section 11(c) of the FLSA "requires employers to 'make, keep, and preserve' employee records, as well as 'the wages, hours, and other conditions and practices of employment' for a time period outlined in the regulations." *United States Dep't of Lab. v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 286–87 (4th Cir. 2019) (quoting 29 U.S.C. § 211(c)); *see* 29 U.S.C. § 211(c) (providing that employers "shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time"). "The FLSA's recordkeeping provisions are vital in ensuring employer compliance with the statute." *Fire & Safety Investigation Consulting Servs.*, 915 F.3d at 287.

DOL regulations explain that employers must maintain payroll records for employees covered under Sections 6 and 7(a) of the FLSA that include, *inter alia*, the following information: "[r]egular hourly rate of pay for any workweek in which overtime compensation is due under section 7(a)," "[h]ours worked each workday and total hours worked each workweek," "[t]otal daily or weekly straight-time earnings or wages due for hours worked during the workday or workweek," "[t]otal premium pay for overtime hours," and "[t]otal wages paid each pay period." 29 C.F.R. § 516.2(a). Employers must preserve payroll records for at least three years. *Id.* § 516.5(a).

Specifically, Section 11(c) of the FLSA provides:

> Every employer . . . shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator[14] as he shall prescribe by regulation or order as necessary or appropriate for the

---

[14] Administrator refers to the Administrator of the Wage and Hour Division of DOL.

> enforcement of the provisions of this chapter or the regulations or
> orders thereunder.

29 U.S.C. § 211(c).

Here, as discussed above, it is undisputed Defendants failed to maintain payroll records that included the hours employees worked in a workweek. This is evident by comparing the payroll records to the ISAS records. (May 4, 2022 Payroll Journal, ECF No. 30-11; Cosme ISAS Summary, ECF No. 30-12; Nov. 30, 2022 Payroll Journal, ECF No. 30-13; Allen ISAS Summary, ECF No. 30-14.) At deposition, Ogbonnah acknowledged that the hours reported in ISAS as worked by the HHAs differed, at least in some instances, from the hours in the payroll records. (Ogbonnah Dep. Tr., ECF No. 30-8 at 82:6–85:20, 90:5–91:11.) That certain records may be available from other sources, in a piecemeal fashion, does not satisfy the record-keeping requirement or otherwise absolve Defendants of their obligations. *Cf. Acosta v. At Home Pers. Care Servs. LLC*, No. 118CV549LMBIDD, 2019 WL 1601997, at *14 (E.D. Va. Apr. 15, 2019) (holding that where the defendants' reliance on "incomplete, internally inconsistent, and difficult-to-access records" does not satisfy the FLSA's "stringent recordkeeping requirements"). Plaintiff has thus shown, based on the undisputed facts, that Defendants violated Section 11(c) as a matter of law by failing to maintain payroll records of the hours employees worked in a workweek.

On Plaintiff's remaining two arguments—that Defendants violated Section 11(c) by failing to include overtime pay on the payroll records and because employees appeared in ISAS records but not in Defendants' payroll record in a given week—the court agrees with Defendants that Plaintiff has not met her burden. As to the first, Plaintiff appears to contend that where an employer has not paid overtime (despite being required to do so), the employer should nonetheless create and maintain a record of having paid it. This seems non-sensical to the court; indeed, it would appear fraud-like to record overtime pay when, in fact, it was not paid. While Defendants' record-

keeping conduct clearly demonstrates the record-keeping violation noted above, the court is not persuaded based on the record before it that Plaintiff has shown she is entitled to judgment as a matter of law on this aspect of the record-keeping claim.

Plaintiff also contends, based on the testimony of Wage and Hour Investigator Elise Anderson, that there were "instances of employees appearing on ISAS records but not appearing on Defendants' payroll records." (ECF No. 30-1 ¶ 48; Anderson Decl., ECF No. 30-18 ¶ 8.) It is not entirely clear to the court that Anderson's declaration supports such a conclusion, and, in any event, Defendants ably dispute this assertion, noting that Plaintiff has failed to identify such record-keeping failures with appropriate specificity. (ECF No. 35 at p. 26.) Based on the record before it, and construing all reasonable inferences in Defendants' favor, Plaintiff has failed to show summary judgment is warranted on this aspect of her Section 11(c) record-keeping claim.

**E. <u>Willfulness</u>**

"[T]he length of the FLSA's statute of limitations depends upon whether the violation at issue was willful." *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015). Where a violation is "willful," the limitations period is three years; where willfulness is not present, the limitations period is two years. 29 U.S.C. § 255(a). "[O]nly those employers who 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]' have willfully violated the statute." *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 358 (4th Cir. 2011) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

An employer acts with reckless disregard of the FLSA where it "should have inquired further into whether its conduct was in compliance with the [FLSA] and failed to make adequate further inquiry." 29 C.F.R. § 578.3(c)(3). Importantly, "a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects" is not a basis to find

willfulness. *Richland Shoe Co.*, 486 U.S. at 128; *see Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 151 (D. Md. 2019) (same). Similarly, mere negligence does not, and cannot, establish willfulness. *Calderon*, 809 F.3d at 130. "Instead, a party demonstrates willfulness by 'choosing to remain ignorant of legal requirements or by learning of those requirements and disobeying them.'" *Sanchez Carrera*, 402 F. Supp. 3d at 151–52 (quoting *Chao v. Self Pride, Inc.*, 232 F. App'x 280, 287 (4th Cir. 2007) (unpublished table decision)). "The issue of willfulness is typically a question of fact, and the burden of proof is on the plaintiff to establish it." *Su v. Spearman, Inc.*, No. CV TDC-20-3585, 2024 WL 665445, at *13 (D. Md. Feb. 16, 2024) (citing *Calderon*, 809 F.3d at 130).

The court agrees that Plaintiff has offered "strong evidence that Defendants knowingly violated the FLSA." (ECF No. 30-1 at p. 19. ) Such evidence includes Defendants' knowledge of overtime requirements and failure to consult a professional related to same,[15] *see* Ogbonnah Dep. Tr., ECF No. 30-8 at 70:16–19, 72:6–118, 76:5–77:1; Defs.' Admissions, ECF No. 30-9 ¶¶ 31–32; Ogbonnah's invocation of his Fifth Amendment right against self-incrimination when he was asked if he had continued his overtime practices after DOL's investigation, *see* Ogbonnah Dep. Tr., ECF No. 30-8 at Dep. Tr. at 114:8 –115:7; and Defendants' contention that its employees were independent contractors despite such employees receiving Form W-2s with Jerry's listed as their employer, *see* Form W-2s, ECF No. 38-1. Defendants, however, assert their (somewhat inconsistent) belief that at least some of the workers were independent contractors—both in Ogbonnah's deposition testimony and his affidavit before the court.

While Defendants' assertion of a good faith assumption appears at odds with the wealth of evidence presented, final determination is better made upon consideration of witness credibility

---

[15] The court observes that failure to consult a professional cuts both ways.

and the overall comparative weight of evidence—functions that are for the factfinder.  *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (recognizing that the court "cannot weight the evidence or make credibility determinations").  Accordingly, the court will deny this aspect of the Motion.

### F.  **Liquidated Damages**

"Any employer who violates the provisions of [Sections 6 or 7 of the FLSA] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  "Liquidated damages 'are considered compensatory rather than punitive in nature.'"  *Roy v. Cnty. of Lexington, S.C.*, 141 F.3d 533, 548 (4th Cir. 1998) (quoting *Reich,* 121 F.3d at 71).  Indeed, liquidated damages are the "norm" in such cases.  *Mayhew v. Wells*, 125 F.3d 216, 220 (4th Cir. 1997); *Lockwood v. Prince George's Cnty., Md.*, 58 F. Supp. 2d 651, 657 (D. Md. 1999), *aff'd sub nom.*, 217 F.3d 839 (4th Cir. 2000) (citation omitted).

Where, however, the employer shows to the court's satisfaction "that the act or omission giving rise" to the violation was "in good faith" and that it "had reasonable grounds for believing" it did not violate the FLSA, the court "may, in its sound discretion, award no liquidated damages." 29 U.S.C. § 260.  This exemption places "a 'plain and substantial burden' upon the employer to persuade the court that the 'failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict.'"  *Mayhew*, 125 F.3d at 220 (quoting *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 357 (4th Cir. 1994)).  "Determining whether an employer exercised good faith or had reasonable grounds for his belief that he was not in violation of the FLSA is an objective inquiry, . . . and 'establishing either element is sufficient to satisfy the statute.'"  *Sanchez Carrera v. EMD Sales,*

*Inc.*, 402 F. Supp. 3d 128, 149 (D. Md. 2019) (first citing 29 C.F.R. § 790.22; next citing *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 132 (4th Cir. 2015)).

Importantly, "'[g]ood faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." *Id.* (quoting *Lockwood*, 58 F. Supp. 2d at 658). The employer "must show more than blissful ignorance of the FLSA's requirement and instead . . . 'that it did not take an ostrichlike approach to the Act.'" *Spearman, Inc.*, 2024 WL 665445, at *15 (quoting *Roy v. Cnty. of Lexington, S.C.*, 141 F.3d 533, 548–49 (4th Cir. 1998)).

Plaintiff again points to the evidence discussed at length above in support of her claim that Defendants' did not act in good faith, or with reasonable grounds for their belief of compliance, under the FLSA. Defendants offer only that they "have demonstrated a good faith in classifying the workers as independent contractors." (ECF No. 35 at p. 29.) On the standard here, the court is persuaded that Plaintiff has met her burden based on the undisputed facts described above—Defendants' knowledge of overtime requirements and failure to consult professionals, Ogbonnah's invocation of his Fifth Amendment right against self-incrimination when he was asked about his overtime practices after the DOL investigation, and the fact that Defendants' purported independent contractors received Form W-2s with Jerry's identified as their employer. Nothing in the record supports a reasonable conclusion that Defendants took "active steps to ascertain the dictates of the FLSA and then move[d] to comply with them," *see Sanchez Carrera v. EMD Sales, Inc.*, 402 F. Supp. 3d 128, 149 (D. Md. 2019), and the court discerns none. Indeed, the evidence supports the very "ostrichlike" approach of blissful ignorance that is insufficient to overcome the norm of liquidated damages. *See Spearman, Inc.*, 2024 WL 665445, at *15, *supra*.

The court appreciates that the inquiries as to willfulness and liquidated damages are similar; however, a finding as to one does not necessitate a finding as to the other, especially at the present stage of litigation.  *See Carrera v. E.M.D. Sales Inc.*, 75 F.4th 345, 354–55 (4th Cir. 2023), *cert. granted,* 144 S. Ct. 2656 (2024), and *rev'd and remanded on other grounds,* 604 U.S. 45 (2025), and *vacated,* No. 21-1897, 2025 WL 2218876 (4th Cir. Feb. 20, 2025) (noting that "[i]t can be the case *both* that an employer was unable to show an objectively reasonable basis for its pay practices *and* that the employer did not intentionally or recklessly underpay" (emphasis in original)).

Accordingly, the court will grant the Motion as to liquidated damages, though makes no finding as to the overall amount of damages to be awarded.

## V.    CONCLUSION

For the reasons set forth herein, by separate order, the Motion (ECF No. 39) will be granted as to the violations of Sections 6 and 7 of the FLSA related to HHAs, as to the violation of Section 11(c) for failure to maintain records reflecting the number of hours worked by HHAs, and as to liquidated damages for the HHAs, and denied without prejudice in all other respects.  The court makes no findings as to the number of violations, the number of employees subject to the recognized violations, or the amount of back wages owed.  As this case remains pending with multiple live issues, and a developing record, the court declines, at this stage, to address Plaintiff's request for permanent injunction relief.[16]

September 19, 2025

/S/

_____

Julie R. Rubin
United States District Judge

---

[16] That said, the court notes that Defendants' contention that a permanent injunction is not warranted because they "have not violated the FLSA" is now unavailing.  (ECF No. 35 at p. 30.)